IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAQUEL RESTO-RIVERA,<br>Plaintiff, | : | CIVIL ACTION |
| v. | : | NO. 25-cv-05536-KMC |
| FRANK BISIGNANO,<br>Commissioner of the<br>Social Security Administration,<br>Defendant. | : | |

**MEMORANDUM OPINION**

KATAYOUN M. COPELAND
UNITED STATES MAGISTRATE JUDGE October 21, 2026

Plaintiff Raquel R.-R. ("Plaintiff") seeks review of the decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 301, *et seq.* (the "Act"). The administrative record ("R.") has been transmitted to the Court. ECF No. 9. For the reasons set forth below, this Court affirms the administrative decision.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed the applications for DIB and SSI that are the subject of this appeal on May 22, 2023. (R. 214-15.) The State agency denied the claims initially, as well as on reconsideration, following which Plaintiff requested a hearing. Administrative Law Judge ("ALJ") Howard Kauffman presided over a hearing held telephonically on October 2, 2024, at which Plaintiff and a vocational expert ("VE") testified. An attorney appeared on Plaintiff's behalf at the hearing. (R. 36-73.)

The ALJ denied the claim in an October 8, 2024 written decision. (R. 18-29.) Plaintiff sought review in the Appeals Council, but that request was denied, making the ALJ's decision the

final determination of the Commissioner. (R. 1-7.) Plaintiff then filed this action in federal court and submitted her Brief and Statement of Issues in Support of Request for Review. ECF No. 14. The Commissioner filed a Response to Request for Review of Plaintiff, ECF No. 15, and Plaintiff filed a reply brief, ECF No. 16.

## II. LEGAL STANDARDS

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The DIB program provides for payment of benefits to individuals who become disabled after having contributed to the Social Security trust fund for a certain period of time under a formula not challenged here. To qualify for DIB, an individual must establish that their disability began prior to the expiration of their "disability insured status." *See generally* 20 C.F.R. §§ 404.101, 404.130, 404.315.

When a claimant files an action in federal court under 42 U.S.C. § 405(g), the Court reviews the factual findings in the administrative decision for "substantial evidence" that the claimant was not disabled. *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91 (3d Cir. 2007). The administrative findings "shall be conclusive" if supported by substantial evidence. *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citing 42 U.S.C. § 405(g)). The evidentiary threshold is "not high," as "substantial evidence" means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 587 U.S. at 103 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The review of any legal questions presented by the Commissioner's final decision, however, is plenary. *Shaudeck v. Commissioner of Social Security Admin.*, 181 F.3d 429, 431 (3d Cir. 1999). *See also Poulos*, 474 F.3d at 91 ("We review the ALJ's application of the law de

novo[.]”).

## III. FACTUAL BACKGROUND

Plaintiff worked until December 2022 as a program coordinator at a food and clothing bank, where she was sometimes required to lift heavy items and typically sat for three hours in an 8-hour workday and walked for the remainder. (R. 39-42.) In 2023, she worked part-time for a period cleaning offices, where she would lift a maximum of 20 to 25 pounds and stand/walk for the entirety of her work time. (R. 42-43.)

Plaintiff applied for disability benefits on May 22, 2023, and alleged that her disability began December 3, 2022. She identified a number of impairments in support of her claim: diabetes, neck problem, hand/wrist/arm problem, depression, asthma, peripheral neuropathy, anemia, arthritis, and spondylolysis. (R. 43, 90.) She testified, however, that “[her] worst thing is [her] problem with [her] neck.” (R. 47.) She had had cervical spine surgery in 2015, fusing the C5-6 vertebrae, but more recently required injections for continued pain. (R. 47-50.)

Although no medical source prescribed it, Plaintiff used a cane for support when standing or walking because she gets dizzy when standing up from a seated position. (R. 45.) At the time of the October 2024 hearing, she was a few days away from having surgery on her left shoulder, where she experienced pain and numbness in her arm that affected her ability to carry anything on that side. (R. 45-46, 49.) She was able to use her right hand to hold her cane despite a history of what she described as carpal tunnel syndrome in her right hand. She testified that she was able to feed and dress herself. (R. 49-50.) She testified that she experienced migraines and had one during the hearing but acknowledged that she could answer the ALJ’s questions and respond appropriately. (R. 52, adding, “I’m fine, yes.”) A typical day for Plaintiff involves preparing meals for her two school-age children and taking them to school. She testified that she was able to do the laundry and shop if

someone helps her carry her bags. (R. 53-56.) She testified that she could walk 15 to 25 minutes before needing to take a break and uses a cane when she goes outside the home. (R. 56-57.) She has difficulty lifting a gallon of milk in her right hand. (R. 57-58.) She testified that she has difficulty sitting for more than 5 to 10 minutes because her lower back hurts and when she travels, she must stop and walk because of horrible pain in her back. (R. 58.) She testified that the muscle relaxers she takes make her dizzy and nauseous and that she typically takes short naps after taking her medications. (R. 58-59.)

Plaintiff's primary care physicians are colleagues Stephen Diamantoni, M.D., and Anthony Lacorte, M.D.[1] She has seen specialists for evaluation of orthopedic and neurological concerns as well.

## IV. DECISION UNDER REVIEW

The issue before the ALJ was whether Plaintiff was disabled under 42 U.S.C. § 1382c(a)(3)(d) from her alleged onset of disability date, December 3, 2022, through the date of decision, October 8, 2024. The ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520(a), 416.920(a).

At Step One, he found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. (R. 21, Finding No. 2.) At Step Two, he found that Plaintiff had two medically-determinable impairments – specifically lumbar degenerative disc disease and left shoulder

[1] As discussed below, at the request of Plaintiff's attorneys, on August 2, 2024, Dr. Lacorte completed a questionnaire regarding her physical capacity for work.

degenerative joint disease – that significantly limited her ability to perform basic work activities, qualifying them as "severe" impairments.[2] (R. 21, Finding No. 3.) At Step Three, the ALJ concluded that these severe impairments, whether considered individually or in combination, did not satisfy the severity of any listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1 – a finding that Plaintiff does not challenge. (R. 23, Finding No. 4.)

Having determined that Plaintiff did not establish disability at Step Three, the ALJ then proceeded to assess Plaintiff's residual functional capacity ("RFC"), which reflects an individual's maximum ability to do physical and mental work activities on a sustained basis despite limitations from impairments. *See* 20 C.F.R. §§ 416.920(e), 416.945. The ALJ found that Plaintiff had the capacity to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she could stand or walk for only 4 hours during an 8-hour workday,[3] could only "occasionally" climb ramps or stairs or engage in other postural activities, and could never climb ladders, ropes, or scaffolds. The ALJ precluded Plaintiff from ever reaching overhead with her left arm but found that she could use her left hand for handling activity on a "frequent" basis. Finally, the ALJ determined that Plaintiff had to avoid concentrated exposure to environmental hazards, unprotected heights, and moving machinery parts. (R. 23, Finding No. 23.) The ALJ justified his RFC finding with reference

---

[2] As discussed below, he also recognized that "major depressive disorder" was among Plaintiff's medically-determinable impairments. But after evaluating the four functional areas set out in the Regulations for evaluation of mental disorders, he concluded that this impairment caused no more than mild limitations in work-related functioning and therefore was non-severe. (R. 22.) Plaintiff objects to that finding and its implication for the RFC analysis.

[3] "Light" work typically involves "a good deal of walking or standing," or up to 6 hours in an 8-hour workday. Light work involves lifting and carrying no more than 20 pounds at a time or 10 pounds frequently. *See* 20 C.F.R. § 416.927(b).

*(continued…)*

to Plaintiff's "lumbar degenerative disc disease and left shoulder degenerative joint disease resulting in complaints of pain, numbness, diminished strength, and reduced range of motion." (R. 27.) He added that "[t]he objective signs, the clinical findings and observations, the claimant's routine and conservative treatment history, and the findings of the State agency medical consultants" supported his assessment. (*Id.*)

The ALJ then applied his RFC finding at Step Four. He agreed that Plaintiff could not perform past relevant work, as the VE testified that the requirements of Plaintiff's past positions as a retail manager and cleaner exceeded what the ALJ found to be her RFC. (R. 27, Finding No. 6.) The ALJ then proceeded to Step Five, at which he was to assess whether Plaintiff was capable of performing any other jobs that exist in significant numbers in the national economy considering her age (as a "younger individual" at age 47), education, work experience, and RFC. (R. 27, Finding Nos. 7-8.) The ALJ recognized that Plaintiff's exertional and non-exertional limitations compromised her ability to perform the full range of light work but considered whether those limitations substantially altered Plaintiff's ability to meet the requirements of particular unskilled occupations. (R. 28.) At the hearing, the VE testified about several jobs at the light exertional level that did not involve significant standing and walking – such as "subassembler," "production solderer," and "bench assembler" – that could be performed by someone with the vocational features posed by the ALJ in his hypothetical. (R. 69.)[4] On the basis of that testimony, the ALJ concluded that Plaintiff was capable of performing jobs that existed in significant numbers in the national

[4] The VE described these jobs, while at the "light" exertional level, as "sit-down jobs": "They're bench jobs, and they're categorized as light because of the production pace, not because of the standing or walking that's involved." (R. 70.) He also testified that use of a cane in the dominant hand for ambulation and balance would not preclude these jobs because they are performed while seated. (*Id.*)

economy and thus was not disabled. (R. 27-28 & Finding Nos. 10-11.)

## V. DISCUSSION

Plaintiff presents two issues for review. First, she contends that the ALJ's RFC finding was not supported by substantial evidence due to his failure to find her mental health impairment to be "severe" at Step Two and his failure to include any limitations related to this impairment in his subsequent RFC finding. Second, she contends that the ALJ's analysis of the opinion of one of her treating physicians, Dr. Lacorte, was legally insufficient as to the ALJ's obligation under 20 C.F.R. § 416.920c to address the supportability and consistency of a medical opinion. (Pl. Br. at 1.) The Commissioner responds that the ALJ's evaluation of Plaintiff's impairments, as well as the RFC finding, are supported by substantial evidence and that the ALJ sufficiently justified his finding that Dr. Lacorte's opinion, expressed on a check-box form, was not persuasive. (Def. Br. at 5, 8.)

### A. Substantial evidence supports the ALJ's determination that Plaintiff's diagnosis of major depressive disorder caused no more than a mild limitation in any area of work-related functioning and required no adjustment to his RFC finding.

At Step Two, an ALJ must ensure that the claimant established the existence of an impairment that lasted (or was expected to last) more than 12 months and caused more than minimal restrictions in the ability to perform work-related activities – if not, the claim will be denied. The ALJ here found that Plaintiff's lumbar degenerative disc disease and left shoulder degenerative joint disease impairments satisfied her burden at Step Two such that the sequential evaluation would continue. But in this portion of his decision he also addressed other medically-determinable impairments alleged by Plaintiff that he found caused no more than minimal limitation in her ability to perform basic mental work activities, rendering them "non-severe." (R. 22.) In accordance with 20 C.F.R. § 404.1520a(b), he analyzed Plaintiff's degree of limitation in four different functional areas, finding the degree of limitation "mild" in each case. He then explained:

> Although the claimant's medical treatment record establishes that the claimant is diagnosed with major depressive disorder (Exhibit 17F, page 24), the claimant's record shows that the claimant receives medications only from her primary care physician for control of her symptoms; she has neither sought nor required more intensive care such as outpatient psychiatric medication management services, outpatient therapy, partial psychiatric hospitalization services, or inpatient psychiatric hospitalizations. Moreover, the claimant's treatment record shows little evidence of any complaints of uncontrolled symptoms of depression following the alleged onset date, noting that her impairment remains well-controlled with medication compliance (Exhibit 17F). The record supports no more than mild limitations in these areas.

(R. 22.)

Plaintiff objects that the ALJ "improperly dismissed [her] treatment as conservative, overturned the diagnoses from Plaintiff's multiple providers, and relied on his own speculation as to the nature of Plaintiff's treatment" to reach the conclusion that major depressive disorder was not a "severe" impairment. (Pl. Br. at 4.) She contends that the ALJ "wholly ignored the nature of Plaintiff's impairment and mischaracterized evidence of record" when he observed that she received medications from her primary care physician and characterized this care as "conservative" as compared to what he envisioned as "more intensive care," ranging from outpatient therapy or outpatient psychiatric medication management services all the way to inpatient treatment. (*Id.*; R. 22.) She complains that the ALJ effectively (and improperly) "require[d] Plaintiff to undergo inpatient hospitalization in order to provide evidence of her disability[.]" (Pl. Br. at 5.)

The Court cannot agree. Plaintiff does not point to anything in the record that contradicts the ALJ's observations about her treatment path, and his observations are correct insofar as the record reflects that, dating back to at least July 2023, she took depression medication prescribed by Drs. Diamantoni and Lacorte and did not pursue more specialized care. Her providers, whose records were found at Exhibits 5F and 17F in the ALJ's record, did not document that any of her appointments were made to address symptoms of depression or the adequacy of her prescribed

medication, nor did either physician adjust her depression medication or dosage to address to any continued symptoms. (R. 438-66, 1159-1234.)

Plaintiff notes, and the Court recognizes, that depression screening questionnaires were administered to Plaintiff at her office visits to Drs. Diamantoni and Lacorte on March 13 and June 5, 2024. In these questionnaires, she checked off that she experienced all of the nine symptoms listed in the form "nearly every day" – including suicidal ideations. (R. 1192, 1204-05.) She also completed a more simplified screening tool on July 6, 2023. (R. 448.) While Dr. Lacorte memorialized in contemporaneous treatment notes of July 6, 2023, and March 13, 2024, that her responses reflected "clinically significant symptoms," he made no further remark about her depression, nor did he alter her treatment plan or medication regimen. (R. 448, 1175.) Plaintiff was continued on the same dosage of Cymbalta, and no further plan was described to address depression. Given this record, the ALJ was permitted to conclude that her treating physician considered her depression condition to be sufficiently controlled by medication.

The Court recognizes that these questionnaires memorialize Plaintiff's subjective complaints at specific points in time. Yet those complaints do not appear to have concerned her physician such that he altered his treatment of her depression. In addition, these subjective complaints were not corroborated by the mental status examinations of the various treating or examining sources in the record.[5] These facts provide sufficient support for the ALJ's conclusion that this impairment was

[5] Plaintiff underwent an internal medicine consultative examination on September 20, 2023, that included a mental status examination. The normal findings of the consultative examiner were noted by the State agency reviewing psychologist in Exhibit 1A and referenced by the ALJ in his decision. *See* R. 22. The ALJ also explained that he found the findings of the State agency consultants, including those at Ex. 1A, to be "persuasive," and they supported his determination that Plaintiff's *(continued…)*

well-controlled during the relevant period and that her RFC need not have reflected any work-related restrictions arising from major depressive disorder.[6] On this underwhelming record, this Court cannot say that the ALJ was required to include any particular accommodation in his RFC finding for Plaintiff's depressive disorder.

**B. The ALJ sufficiently complied with the obligation to evaluate the supportability and consistency of Dr. Lacorte's opinion.**

Plaintiff's remaining contention is that the ALJ committed legal error, "precluding a substantial evidence review," where he allegedly failed to adequately address the supportability and consistency of an opinion Dr. Lacorte offered. (Pl. Br. at 7.)

The opinion at issue is contained in a three-page questionnaire developed by Plaintiff's counsel. The form invites the provider to identify the patient's diagnosis, symptoms, medication side effects and otherwise asks the provider to check boxes as to the degree of various potential functional limitations. Dr. Lacorte's August 2, 2024 response indicated that he had treated Plaintiff every three months since 2023 and that his responses related to that time period. (R. 1156, 1158.) He cited her diagnoses of "cervicalgia" and "lumbago," and described her symptoms as "chronic back pain, chronic neck pain." (R. 1156.) He opined that those symptoms were "often" severe enough to interfere with the attention and concentration required to perform simple work-related tasks. (*Id.*) He identified two particular medications Plaintiff takes that could give rise to fatigue and somnolence. (*Id.*) He opined that Plaintiff would need to recline or lie down in excess of typical breaks during a normal workday. (*Id.*) He estimated that Plaintiff could not walk even one city

mental impairment was non-severe. (R. 22.)

[6] At the October 2, 2024 hearing, Plaintiff testified that she had just begun to see a mental health practitioner of some sort, and that she was due to see a psychiatrist the following month. (R. 52-53.) No further information was provided about what prompted that development, and she did not describe any changes in her treatment.

block without rest or significant pain; that she could sit for 15 minutes at a time (but only for a total of one hour in an 8-hour workday); and that she could stand/walk for 5 minutes at a time. (*Id.*) He also estimated that she would need to take unscheduled breaks lasting 30 to 40 minutes during a workday because she "has pain all day." (*Id.*) He reported that she could only "occasionally" carry items less than 10 pounds, could only use her hands and fingers for work activities 80% of the workday, and could not engage in reaching activities with either arm. (R. 1157.) Dr. Lacorte's treatment notes reflect a corresponding visit on this date for completion of a form, *see* R. 1169-70, but no notes describing a physical examination or other remarks. The form invited the provider to "attach all relevant treatment notes, laboratory and test results" but did not ask the provider to identify supporting evidence for any of his particular responses, and Dr. Lacorte did not provide any. (R. 1156-58.)

In the portion of his decision in which he explained his RFC finding, the ALJ included the following:

> The undersigned also does not find persuasive the opinion of Anthony Lacorte, M.D., determining the claimant as able to sit for no more than 1 hour and stand/walk for 0 hours during an 8-hour workday; as able to lift/carry less than 10 pounds occasionally; as unable to reach; and as likely to be absent from work more than four times per month (Exhibit 16F). Dr. Lacorte's opinion is poorly supported, noting the limitations were based on the claimant's subjective reports rather than clinical or objective data. Additionally, the opinion is inconsistent with the claimant's external treatment records, showing the claimant's symptoms as not being fully explained by objective and clinical medical evidence and providing little evidentiary support for medical necessity of the ambulatory aide. The claimant's records, likewise, show little evidence that the claimant has demonstrated any significant difficulty with prolonged sitting as suggested by Dr. Lacorte.

(R. 26.) Plaintiff contends that the ALJ's discussion of the "supportability" of this opinion and its "consistency" with external treatment records were insufficient to discharge his obligations under 20 C.F.R. §§ 404.1520c and 416.920c.[7] (Pl. Br. at 7.) This Court disagrees.

The ALJ faulted Dr. Lacorte's opinion as "poorly supported" because the limitations Dr. Lacorte cited appeared to be "based on the claimant's subjective reports rather than clinical or objective data." (R. 26.) This was a reasonable conclusion for the ALJ to reach, given the absence of any explanation in either the opinion form or in Dr. Lacorte's contemporaneous treatment notes for these extreme limitations – that in an 8-hour workday Plaintiff could sit for only 1 hour total and stand and walk less than 1 hour, presumably meaning that she would need to spend 6 hours reclined.

The ALJ also faulted Dr. Lacorte's opinion as "inconsistent" with the record from other sources inasmuch as Plaintiff's complaints could not be fully explained by objective or clinical evidence; that there was little support that Plaintiff required the use of a cane; and that there was little evidence that Plaintiff was unable to maintain a seated position as Dr. Lacorte indicated. (R. 26.) These were fair conclusions to draw from the record. Two paragraphs earlier in his decision, the ALJ cited the opinions of the State agency medical consultants, who upon initial review and on reconsideration estimated that Plaintiff could stand/walk for up to 4 hours in a workday. (R. 25-26.) They also opined that she could sit, with normal breaks, for "about 6 hours" in an 8-hour workday.

[7] These identical provisions explain how adjudicators consider medical opinions in the record. The provisions identify a number of factors that will be considered. They further provide that the most important ones are the factors of "supportability" and "consistency," and that the adjudicator therefore will explain how those factors are considered. *See, e.g.,* 20 C.F.R. § 416.920c(b)(2), (c). "Supportability" refers to the extent to which relevant objective medical evidence and supporting explanations are presented by the medical source to support the opinion. *Id.*, § 416.920c(c)(1). "Consistency" looks to the consonance of the medical opinion with the evidence from *other* medical *(continued…)*

(R. 89.) Their opinions were supported by a review of the medical record gathered in the initial and reconsideration phases in 2023 and early 2024, including the consultative examination. They explained that a standing/walking limitation was justified because of "unsteady gait; unable to heel/toe walk; limited squat; positive [straight leg raise test] with radicular pain in [right lower extremity]; reduced [range of motion] in spine." (R. 89.) But they did not identify anything in the record suggesting that Plaintiff degenerative disc disease would impact her tolerance for sitting.

The Regulations require the ALJ to consider and specifically discuss his evaluation of the supportability of a medical opinion and its consistency with other sources of evidence. The ALJ did that here. His decision as a whole meets the substantial evidence standard for it to be upheld on review under 42 U.S.C. § 405(g). This Court is not authorized to re-weigh the evidence or substitute its conclusions for those of the ALJ. *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).

## VI. CONCLUSION

The ALJ here was presented with a record containing a treating physician opinion that Plaintiff was hampered by extreme limitations in a variety of exertional capacities. The ALJ found the opinion to be poorly supported and inconsistent with the record as a whole, which permitted him to discount it. In a similar vein, where the record did not memorialize any provider's observations of limitations Plaintiff faced as a result of major depressive disorder, and where her treatment history was consistent with that condition having been adequately controlled by prescribed medication, the ALJ need not have included any non-exertional restrictions in his finding of Plaintiff's RFC.

The request for review will be denied. An appropriate order will follow.

---

sources and nonmedical sources in the claim. *Id.*, § 416.920c(c)(2).